## In re BALLIN et al.

### (Circuit Court, S. D. New York. January 27, 1891.)

CUSTOMS DUTIES.

 Construction of the act of May 9, 1890, entitled "An act providing for the classification of worsted cloths as woolens." Under this act the secretary of the treasury must finally classify the merchandise therein named, and that power is vested in no other officer.

At Law.

The firm of Ballin, Joseph & Co. imported by the City of Richmond, July 21, 1890, into the port of New York certain worsted cloths, composed entirely of worsted, which were returned by the appraisers on the invoice ·as "woolen cloths" under 80 cents, and duty was thereupon assessed on said merchandise by the collector at the rate of 35 cents per pound and 35 per centum ad valorem, under the provisions of the tariff act of March 3, 1883, (Tariff Ind. par. 362,) and the act of May 9, 1890, entitled "An act providing for the classification of worsted cloths as woolens." The importers duly appealed from this assessment of duty to the board of United States general appraisers, in pursuance of section 14 of the act of June 10, 1890, entitled "An act to simplify the laws in relation to the collection of the revenues." The board of United States general appraisers affirmed the decision of the collector. The importers thereupon, and under the provisions of section 15 of the said act of June 10, 1890, took the necessary proceedings for a review of the decision of the board of general appraisers by the United States circuit court upon their return and the record. The importers, in their protest, alleged: (1) That the said act of May 9, 1890, was never passed according to law, because no quorum was present in the house of representatives. (2) Said act was never passed according to law, and never became a law; because, when passed, a majority of the members of the house of representatives were not present, and it was certified to have been passed when it had not been passed, in violation of section 5, art. 1, of the constitution of the United States. (3) Because a quorum of the house of representatives did not vote upon said act. (4) Because said act confers no power or authority upon the collector to assess and take duties upon

the said importations at the rate of 35 cents per pound and 35 per cent. *ad valorem.* (5) Because, as a matter of fact, the secretary of the treasury had not seen the goods, and had never in fact classified them for duty. (6) Because said act does not repeal any act imposing a pre-existing rate of duty upon said importations. (7) Because said act does not and cannot operate to change the duty upon manufactures "wholly or in part of worsted," and not "in part of wool," as provided for in the act of March 3, 1883. (8) Because whether the secretary of the treasury has classified said goods as woolen cloths or not does not alter the fact that they are manufactures of worsted, and dutiable accordingly. The importers thus attacked the validity of the act of congress approved May 9, 1890, and known as the "Dingley Bill," entitled "An act providing for the classification of worsted cloths as woolens." This acts reads as follows:

"That the secretary of the treasury be, and he is hereby, authorized and directed to classify as woolen cloths all imports of worsted cloth, whether known under the name of 'worsted cloth' or under the name of 'worsteds' or 'diagonals,' or otherwise."

*Stephen G. Clarke* and *Edwin B. Smith*, for importers.

*Edward Mitchell*, U. S. Atty., and *Henry C. Platt*, Asst. U. S. Atty., for collector and government.

The latter argued that while the contention of the importer is that the secretary of the treasury is directed by the act of May 9, 1890, personally to classify worsted cloths as woolens, the language of the act is susceptible of a different construction. Section 248 of the United States Revised Statutes provides that "the secretary of the treasury shall from time to time digest and prepare plans for the improvement and management of the revenue, and for the support of the public credit; shall superintend the collection of the revenue, * * * and generally shall perform all such services relative to the finances as he shall be directed to perform." Section 249 provides that "the secretary of the treasury shall direct the superintendence of the collection of the duties on imports and tonnage as he shall judge best." Section 251 provides that "the secretary of the treasury shall make and issue from time to time such instructions and regulations to the several collectors. * * * He shall prescribe forms of entries, oaths, bonds, and other papers, and rules and regulations, not inconsistent with law, to be used under and in the execution and enforcement of the various provisions of the internal revenue laws, or in carrying out the provisions of laws relating to raising revenue from imports, or to duties on imports, or to warehousing. He shall give such directions to collectors, and prescribe such rules and forms to be observed by them, as may be necessary for the proper execution of the law," etc. Section 252 provides that "the secretary of the treasury, under the direction of the president, shall from time to time establish such regulations, not inconsistent with law, as the president shall think proper, to secure a just, faithful, and impartial appraisal of all goods, wares, and merchandise imported into the United States," etc. Section 2652 provides that "it shall be the duty of all officers of the customs to execute and carry into effect all instructions of the secretary of the treasury relative to the execution of the revenue laws; and, in case any difficulty shall arise as to the true construction or meaning of any part of the revenue laws, the decision of the secretary of the treasury shall be conclusive and binding upon all officers of the customs." Section 2949 provides that "the secretary of the treasury from time

to time shall establish such rules and regulations, not inconsistent with the laws of the United States, to secure a just, faithful, and impartial appraisal of all merchandise imported into the United States," etc.

The secretary of the treasury is the chief officer and head of that department, and all revenue and customs officials are, in contemplation of law, his subordinates, assistants, or employes, and subject to his general direction and control in revenue matters. Article 556 of the treasury regulations reads as follows: "Collectors will make immediate report of the classification given at their respective ports to all imported goods not enumerated in the tariff. When any portion of the law affecting the classification of enumerated articles may be of doubtful meaning, collectors will in like manner report the classification adopted in such cases. Appraisers are required to report to the collector their opinion as to the proper classification of imported articles submitted to their examination, but in case of disagreement the decision of the question rests with the secretary of the treasury."

Interpreting the act of May 9, 1890, in the light of existing statutes, congress never intended that the secretary of the treasury should personally classify "worsted cloths," or any other merchandise, for duty, but that such classification was to be made, under his general direction, by the officers, his subordinates, agents, and employes, whose particular duty it was, under the law and in the usual course of business, to classify such goods. It would be absurd and impracticable for the secretary of the treasury personally to engage in the duties of an appraiser or collector by himself, inspecting goods at every port in this country, and passing judgment upon them, and formally announcing such judgment. The act itself operated to place worsted cloths in the same category with woolen cloths as to classification and rates of duty.

On May 13, 1890, the secretary issued a circular calling the attention of the collectors of customs to this law. Treas. Dec. No. 10,020. This was a promulgation of the law, for the guidance of such officers. It is a rule that in the interpretation of statutes courts should not defeat legislative intent by adhering too rigidly to the letter, nor follow the mere language to consequences which are clearly absurd. *Oates* v. *Bank*, 100 U. S. 239. The meaning of the legislature in a statute may be extended beyond the precise words used in the law, from the reason or motive which the legislature proceeds, from the end in view, or the purpose designed. *U. S.* v. *Freeman*, 3 How. 556, 565; *U. S.* v. *Buchanan*, 9 Fed. Rep. 689; *Aldridge* v. *Williams*, 3 How. 9; *Ruggles* v. *Illinois*, 108 U. S. 537, 2 Sup. Ct. Rep. 832; *Ogden* v. *Strong*, 2 Paine, 584; *U. S.* v. *Warner*, 4 McLean, 463. Intent is to prevail over the literal meaning of the words. *In re New York Dist. Ry. Co.*, 42 Hun, 621; *People* v. *Terry*, 108 N. Y. 1, 14 N. E. Rep. 815; *In re Mayor of New York*, 99 N. Y. 569, 2 N. E. Rep. 642. Legislative acts are not to be interpreted by the courts in a hypercritical and captious spirit. In the construction of statutes the sense and spirit of a statute prevails, and a construction will not be put upon a statute which will render it nugatory, if it is susceptible of a construction that will give it a reasonable operation and effect. *Manufacturing Co.* v. *McCollock*, 24 Fed. Rep. 667. The object of this legislation was to make the duty upon so-called "worsted cloths" the same as upon "woolen cloths," under the tariff act of March 3, 1883, then in force, which provided for a duty upon woolen cloths valued under 80 cents per pound of 35 cents per pound and 35 per cent. *ad valorem.* Tariff Ind. par. 362. A case had previously been tried in this court (*Ballin* v. *Magone*, 41 Fed. Rep. 921) in which a controversy over the proper rate of duty under the act of March 3, 1883, on this very class of goods, had been decided; and this court differentiated the goods, holding that the worsted cloth was not properly classifiable as woolen cloth, but was properly dutiable (under Tariff Ind. par. 363) as a "manufacture of worsted," at a lower rate of duty. It doubtless appeared absurd to the

national legislature that worsted cloths, used for the same purposes as woolen cloths, and dealt in by the same class of dealers, should be allowed to be imported into this country at a less rate of duty; that the wool carded and the wool combed, both being in substance wool, although legally differentiated in the tariff act of March 3, 1883, ought to pay the same rates of duty. The act of May 9, 1890, was passed to correct that inequality in the act of March 3, 1883. It was a proper exercise of the legislative power. It was a correction of an apparent oversight in the act of 1883. Congress certainly had the power to authorize the secretary of the treasury to classify worsted cloths as woolen cloths. The act designates the official, and not the individual, to make the classification. It refers to the secretary of the treasury as the official head of the revenue department in the government. When it directs him to act, it presupposes that he will act through his subordinates, collectors, revenue officers, or others, whose duty it is to carry out the law, under his supervision, control, and direction. This is the sound and reasonable construction of the law of 1890.

Bearing in mind previous and concurrent laws, the history of this legislation, and the intent of congress to so change the law that "woolen cloths" and "worsted cloths" should pay the same rate of duty, and taking the words of the statute in their plain, every-day sense, there can be no difficuty in coming to the conclusion that the act of May 9, 1890, is valid, and effectuates the purposes which it was intended to subserve. It is a familiar principle of law that what a man does by another who was duly authorized to act for him, or under his direction, he does by himself. The secretary of the treasury, by his subordinates, collector, or other agent, in the performance of the duty assigned to them classified these goods for duty in the usual course of procedure.

The next question presented is the allegation that the act of October 1, 1890, never passed the house of representatives and senate. This includes the objections (1) that a quorum of the house of representatives was not present when the vote was taken on the bill: (2) that a quorum of the house did not vote on the bill. In the Congressional Record of May 1, 1890, p. 4188, the proceedings of the house of representatives disclose the following facts in taking the vote on the bill under consideration: Yeas, 138; noes, none; not voting, 189. "*The Speaker.* The clerk will announce the names of members present and not voting. The clerk read. [Here follows 75 names.] *The Speaker.* The names of the members not voting, 75 in number, together with 138 voting in the affirmative, being 213 in all, more than a quorum necessary under the constitution to transact business, the chair makes the following announcement of the vote: The yeas are 138, noes, none, and the bill is passed."

This being a public record of the legislative proceedings, the court is at liberty to take judicial notice thereof without formal proof being made. *South Ottawa* v. *Perkins,* 94 U. S. 260. The proceedings unquestionably show a majority of all members to be present. A majority constitutes a quorum to do business.

Article 1, § 5, of the constitution of the United States provides that a majority of each house shall constitute a quorum to do business; that a smaller number may adjourn from day to day, and may be authorized to compel the attendance of members under certain penalties. Each house may also determine the rules of its own proceedings. Each house shall also keep a journal of its proceedings. At the desire of one-fifth of those present, the yeas and nays of the members of either house on any question shall be entered in the journal. The power of the house to make its own rules under this constitutional authority necessarily embraces the authority to adopt any proper mode of ascertaining the presence of a quorum in

the house, not expressly or impliedly prohibited by the constitution. The fifty-first congress, by rule 15, par. 3, determined the rule to be as follows: "On the demand of any number, or at the suggestion of the speaker, the names of members sufficient to make a quorum in the hall of the house who do not vote shall be noted by the clerk and recorded in the journal, and reported to the speaker with the names of the members voting, and be counted and announced in determining the presence of a quorum to do business."

The announcement made by the speaker on the passage of the bill in question was in conformity to this rule of the house of representatives, which had been determined and adopted under its constitutional power to determine the rules of its own proceedings, and to keep a journal of its own proceedings. There was a majority of a quorum of the house of representatives actually present at the time, according to the journals of its proceedings, which journal is presumed to speak the truth. There is no clause in the federal constitution which curtails or limits the general power of the house of representatives to make its own rules for its own proceedings. It has always been the law, both in England and in America, in reference to corporations, public and private, that a majority of a quorum of an assembly actually present must control, although less than a quorum may vote. *Rex* v. *Foxcroft*, 2 Burrows, 1017; *Gas Co.* v. *City of Rushville*, 121 Ind. 207, 23 N. E. Rep. 72; *County of Cass* v. *Johnson*, 95 U. S. 360; *St. Joseph Tp.* v. *Rogers*, 16 Wall. 644; Ang. & A. Corp. §§ 126, 127; Grant, Corp. 71; 1 Dill. Mun. Corp. §§ 278, 282; North Amer. Rev. Sept. 1890, p. 372. See authorities cited in Decision of Board of General Appraisers, G. A. 57.

LACOMBE, Circuit Judge, (*orally.*) There is nothing on the face of this act indicating that it is intended to repeal, or in any way alter, any act imposing customs duties. It is contended that in the existing state of affairs when this act was passed, in the former statutes, in the decisions of the courts, and in the debates of congress, we may find sufficient to warrant the conclusion that it was the intention of congress by the passage of this act to deal with the question of the duty to be laid upon goods such as are imported here, and to change their *status*, so as to lay upon them a higher rate. Conceding that for the purposes of this argument only, (and it is only for the purposes of the argument that I am prepared to concede that proposition,) let us see with what machinery they undertake to carry out that intent. There already existed an elaborate and well-considered scheme for appraising and classifying imported articles by means of appraisers and their subordinates, who made examinations and reports touching the component materials and values of goods; and by means of local officers (the collectors) in the respective ports where the goods came, who made their own classifications relating to them. There had been elaborated a sufficient scheme, which had been in force for many years, with the intention of securing by the machinery thus employed a faithful, just, impartial, and truthful ascertainment of the real facts of each case, and of classifying the goods according to such facts as were thus ascertained. This act, however, proceeds upon an entirely novel theory. It provides expressly for a classification in direct non-conformity to the facts. It authorizes an officer of the government who may find an import to be in fact an article which under the tariff laws pays one rate of duty to call it something else,

which it is not, in order to enable the revenue officers to levy upon it a rate of duty which that other article which it is not pays. Now this is a very extraordinary species of legislation, and there is no reason why we should be surprised to find that congress has confided the exercise of those peculiar functions to a very high officer of the government. When congress has expressly confined that exercise, as it has by the language of this act, to the secretary of the treasury, I do not think that the courts are warranted in finding that power in any other officer. I do not mean by that to suggest for one moment that under the phraseology of this act it is the duty of the secretary of the treasury to himself examine the packages of goods, to handle or see their contents; but, having been informed and advised as to the facts in the same way in which he is informed and advised upon any facts upon which he is required to pass, by the examination and report of such trustworthy subordinates as he may select, the final classification of the particular articles is one to be made by him. The return here distinctly finds as a fact that he reached no such conclusion, nor undertook to do so, in the case of the importations here involved. For that reason, I think that his action cannot be sustained. The decision of the board of general appraisers, therefore, in this case is reversed.